UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JULIAN BENNET,<br>      Plaintiff,<br><br>      v.<br><br>WASHINGTON, et al.,<br>      Defendants. | No. 3:22-cv-1036 (SRU) |

## INITIAL REVIEW ORDER

Julian Bennet, currently incarcerated at Garner Correctional Institution ("Garner"), brings a complaint under 42 U.S.C. § 1983 against seventeen defendants in their individual capacities—Warden Washington, Deputy Warden Thomas Kenny, Deputy Warden Snyder, Captain Lugo, Shift Commander George Hurdle, Officer Griffin, Officer Kenney, Officer Ortiz, Officer Price, Officer Kwaak, Officer Stager, Officer Pelletieri, Lieutenant Grant, Lieutenant Cary, Lieutenant McKellin, Nurse Luara Oliveris, and Inmate Shawn Milner.[1] Doc. No. 1 at 3-4. Bennet's claims principally arise from several alleged incidents in late 2021, during which Bennet was physically attacked by Milner. *Id*. at ¶¶ 48-81.

For the reasons set forth below, I conclude that Bennet has plausibly pled a cognizable Eighth Amendment deliberate indifference claim, a section 1983 conspiracy to violate Bennet's constitutional rights claim, an Eighth Amendment excessive force claim, a section 1983 failure to intervene claim, and several tort-law claims.

---

[1] Throughout this Order, I refer to both Deputy Warden Kenny and Officer Kenney by their titles, in addition to their surnames, for the sake of clarity. I refer to all other parties by their surnames only.

I.      **Factual Background**

Julian Bennet is a convicted state prisoner presently incarcerated at Garner Correctional Institution ("Garner"). He alleges that, at the time of the incidents that form the bases of his complaint, he was classified in Phase 3 of Administrative Segregation. Doc. No. 1 at ¶¶ 32-33. He explains that "[t]here are daily memos, post orders and instructions issued to all" staff within his unit, including to Washington, Deputy Warden Kenny, Snyder, Lugo, and Hurdle. *Id.* at ¶¶ 36-37, 43. Those briefings provide staff with specific rules for inmates on Administrative Segregation, including that "inmates on A/S phase 2 and A/S phase 3" and "inmates with known conflicts" are to be physically separated at all times. *Id.* at ¶¶ 36-37 (cleaned up). Staff are also briefed on "all [incidents], operations, conflicts, and issues regarding the inmate population." *Id.* at ¶ 43.

Bennet alleges that on or about November 24, 2021, Milner, another prisoner, began Administrative Segregation Phase 2 at Garner. *Id.* at ¶ 44. Bennet "and Milner have a documented history of conflicts." *Id.* at ¶ 45. That history was briefed to Garner unit staff— including to Washington, Deputy Warden Kenny, Snyder, Hurdle, Lugo, and Griffin—by the Unit Manager Captain upon Milner's arrival at Garner. *Id.* at ¶¶ 45-46. Bennet alleges that on November 28, 2021, Milner "engage[d] in significantly disruptive conduct," that resulted in Milner being extracted from his cell. *Id.* at ¶ 55. Bennet avers that Milner proceeded to strike a corrections officer in the head. *Id.* Notwithstanding that conduct, Washington did not regress Milner to an earlier phase of Administrative Segregation. *Id.* at ¶ 56.

Bennet further alleges that during the first week of December 2021, Griffin "improperly place[d] Milner" near Bennet "in a neighboring outside . . . cage" during outdoor recreation, even though the procedure was to maintain at least one cage between two inmates who conflict with one another. *Id.* at ¶ 47. Bennet alleges that Milner removed a bottle of urine from his

clothing, held it through the caging, and sprayed Bennet with "a large quantity of urine." *Id*. at ¶ 48. Bennet alleges that Griffin observed that conduct, laughed, and did not interfere. *Id*. at ¶ 49. Bennet further alleges that Milner verbally harassed and threatened Bennet for the remaining two hours of recreation. *Id*. at ¶ 50. Bennet asked Griffin to be permitted to return inside to shower and change clothing, but Griffin refused. *Id*.

After the incident in the recreation cage, Bennet alleges that Milner continued to harass him. He avers that Milner would "verbally threaten [him] with physical violence, further assault[] [him] with bodily waste, and [would] harass [Bennet] by yelling out of his cell door on a daily basis"—"every single morning, noon and night for hours at a time." *Id*. at ¶ 52.

Bennet also alleges that on December 26, 2021, Milner violently assaulted Bennet in the shower. *Id*. at ¶ 60. He alleges that several of the defendants—namely, Officer Kenney, Ortiz, Price, Kwaak, Stager, Pelletieri, Grant, Cary, and McKellin—engaged in a conspiracy to permit Milner to assault Bennet without consequences. Bennet describes the December 26 incident as follows. On the evening of December 26, Bennet left his cell to attend gym recreation. *Id*. at ¶ 62. While Bennet was out of his cell, several of the defendants removed Milner from his cell, "placed him in the unit bottom tier shower," and "after shutting the door which locks automatically they then inserted the key and manually unlocked the door leaving it unsecured." *Id*. The defendants then permitted Milner to shower for "over an hour," even though prison policy allots only fifteen minutes for showers. *Id*. at ¶ 63. One hour after Bennet had left his cell to attend gym recreation, Bennet "returned to the unit and entered the shower." *Id*. at ¶ 65. He took his fifteen-minute shower, then exited. *Id*. Upon Bennet's exit, Milner "opened the unsecured shower door," came at Bennet from behind, and began "repeatedly striking [Bennet] in the back of the head and the face with closed fists." *Id*. at ¶ 66. Bennet alleges that Officer

Kenney, Ortiz, Price, Kwaak, Stager, and Pelletieri "waited and did not intervene until the assault had [begun]." *Id*. at ¶ 67. Eventually, Ortiz and Officer Kenney intervened and pulled Milner away from Bennet and held Milner back. *Id*. at ¶ 68. Meanwhile, Price, Kwaak, Stager, and Pelletieri tackled Bennet "causing his head to violently strike the concrete wall then floor," and Bennet suffered injury including "a brief loss of consciousness." *Id*. Bennet further alleges that Pelletieri, Kwaak, and Stager struck him "several times in the body" and "force[d] his face down into the ground mashing his face against the tile floor." *Id*.

After the incident, Grant, Cary, and McKellin placed Bennet and Milner in punitive segregation cells. *Id*. at ¶ 69. Bennet alleges that they then strip searched him. *Id*. He further alleges that Grant, Cary, and McKellin intentionally did not sign the assault disciplinary report issued to Milner—although signing such reports was a routine duty—resulting in the disciplinary report being dismissed and "Milner receiv[ing] no disciplinary action for his attack." *Id*. at ¶¶ 70- 71. Milner returned to his cell "the following day or next." *Id*. at ¶ 70.

Bennet further alleges that Washington, Deputy Warden Kenny, Snyder, Lugo, Hurdle, and the "floor" correction officers "[took] no action to secure [Bennet's] safety from Milner" and continued to house the two "in the same unit only [four] cells apart." *Id*. at ¶ 74. Bennet alleges that "[o]n a near daily basis" after the December 26, 2021 assault, "Griffin, [Officer] Kenney, Ortiz, and Pelletieri allowed Milner to exit his cell and come to [Bennet's] cell and verbally harass and threaten him and spray urine and fecal matter at him through the cell door." *Id*. at ¶ 75. Bennet alleges that the aforementioned conduct "occurred on first and second shift at least four times a week." *Id*. Bennet contends he wrote several requests to Washington, Deputy Warden Kenny, Snyder, Lugo, and Hurdle seeking an end to the incidents, but no action was taken. *Id*. at ¶¶ 76-77. Bennet also alleges that he asked Grant and Cary "[o]n numerous

4

occasions . . . to stop allowing their officers to allow Milner to walk around the unit and assault [Bennet]." *Id*. at ¶ 75.

On December 27, 2021, Bennet saw Oliveris for medical attention for the injuries he had sustained in the December 26 attack. *Id*. at ¶ 79. Bennet alleges that he "reported his injuries . . . to her, which included pain in the neck, back, and face; severe headaches, nausea, dizziness, faintness, and blurred vision." *Id*. (cleaned up). He further requested a medical evaluation, but Oliveris denied him one and "stated it was all normal." *Id*. Bennet then asked Washington and Snyder for medical attention when the two were conducting their unit tours, and the two did not "secure any medical treatment" for Bennet. *Id*. at ¶ 80. Bennet alleges that he "continues to suffer splitting headaches, blurred vision, bouts [of] nausea, dizziness and faintness from an untreated concussion, and . . . psychological traumas." *Id*. at ¶ 81.

Bennet also avers that on December 29, 2021, "Griffin again placed Milner" in a recreation cage that was adjacent to Bennet's, "allow[ing] [Milner] to assault [Bennet] with bodily waste" again. *Id*. at ¶ 78.

## II.   Standard of Review

Under section 1915A of Title 28 of the United States Code, I must review prisoner civil complaints and dismiss any portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A. Although detailed allegations are not required, the complaint must include sufficient facts to afford the defendants fair notice of the claims and the grounds upon which they are based and to demonstrate a right to relief. *See Bell Atlantic v. Twombly*, 550 U.S. 555-56 (2007). Conclusory allegations are not sufficient. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff must plead "enough facts to state a

claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Nevertheless, it is well-established that "[*p*]*ro se* complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)); *see also Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants).

### III. Discussion

Bennet attempts to bring several constitutional-law claims against the defendants. *See generally* Doc. No. 1 at ¶¶ 1, 4, 85-102. Upon review of his complaint, I discern the following cognizable claims: an Eighth Amendment deliberate indifference claim against all prison staff defendants; a conspiracy to violate Bennet's constitutional rights claim against Officer Kenney, Ortiz, Price, Kwaak, Stager, Pelletieri, Grant, Cary, McKellin, and Milner; an Eighth Amendment excessive force claim against Price, Kwaak, Stager, and Pelletieri; a failure to intervene claim against Ortiz, Officer Kenney, Price, Kwaak, Stager, and Pelletieri; and the tort-law claims of battery, assault, and intentional infliction of emotional distress against Milner.

#### A. Eighth Amendment Deliberate Indifference

Bennet brings an Eighth Amendment deliberate indifference claim against the defendants. *See generally* Doc. No. 1. The Eighth Amendment to the U.S. Constitution protects against the infliction of cruel and unusual punishment. *See* U.S. Const. amend. VIII. An incarcerated plaintiff seeking to advance an Eighth Amendment claim must establish both an objective and a subjective element. He must show "(1) a deprivation that is 'objectively, sufficiently serious' that he was denied 'the minimal civilized measure of life's necessities,' and (2) a 'sufficiently culpable state of mind' on the part of the defendant official, such as deliberate

6

indifference to inmate health or safety." *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001) (citation omitted).

I first turn to the objective element. "[C]onditions that place a prisoner at a 'substantial risk of serious harm' from other inmates may constitute cruel and unusual punishment." *Walker v. Schult*, 717 F.3d 119, 128 (2d Cir. 2013); *see also Farmer v. Brennan*, 511 U.S. 825, 833 (1994) ("Prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners.") (collecting cases and quoting *Cortes–Quinones v. Jimenez–Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)). Furthermore, "unsanitary conditions" of an "egregious" nature can also "rise to the level of cruel and unusual punishment." *Walker*, 717 F.3d at 127 (collecting cases). Moreover, medical injuries such as concussions can meet the objective element if they are sufficiently serious. *See McKinney v. New Haven Police Dep't*, 2017 WL 5137583, at *3 (D. Conn. Nov. 6, 2017); *see also Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). Bennet alleges that the defendants facilitated another inmate to violently attack him and to subject him to unsanitary conditions. Bennet also alleges that certain of the defendants were deliberately indifferent with respect to the injuries he had sustained in the course of the attack and with respect to the injuries he endured after the attack. Bennet has therefore alleged sufficient facts to meet the objective element at this stage of the proceedings.

I next turn to the subjective prong—whether Bennet has alleged facts from which a sufficiently culpable state of mind can be inferred for each of the defendants. Bennett must show that each of the defendants violated the Constitution through his or her own conduct, and not merely through those defendants' supervision of other individuals who committed the violation. *See Tangreti v. Bachmann*, 983 F.3d 609, 619 (2d Cir. 2020).

Upon review of the allegations in the complaint, I conclude that Bennet has pled an Eighth Amendment deliberate indifference claim against defendants Washington, Deputy Warden Kenny, Snyder, Lugo, Hurdle, Griffin, Officer Kenney, Ortiz, Price, Kwaak, Stager, Pelletieri, Grant, Cary, and McKellin. That claim may proceed against the defendants on the theory that they were aware of the risk that Milner posed to Bennet's safety but took inadequate measures to protect Bennet from Milner's behavior.

I further conclude that Bennet has also pled an Eighth Amendment deliberate indifference claim against Oliveris, Washington, and Snyder for deliberate indifference to Bennet's medical needs following the December 26, 2021 incident. That claim may proceed on the theory that Bennet had suffered serious injuries after the December 26 attack, that he reported those injuries to Oliveris, Washington, and Snyder, and that none of those defendants took any action in response.

B.  Section 1983 Conspiracy

I also liberally construe Bennet's complaint to raise a Section 1983 conspiracy to violate constitutional rights claim against Officer Kenney, Ortiz, Price, Kwaak, Stager, Pelletieri, Grant, Cary, McKellin, and Milner.[2] "To prove a [section] 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).

In his complaint, Bennet alleges that Officer Kenney, Ortiz, Price, Kwaak, Stager, Pelletieri, Grant, Cary, McKellin, and Milner conspired to orchestrate Milner's December 26,

---

[2] Milner is not a state actor. Thus, he is only subject to section 1983 liability to the extent that he acted in concert with other defendants (all state actors) to deprive Bennet of his constitutional rights. *See Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002).

2021 attack on Bennet. *See* Doc. No. 1 at ¶¶ 60-61. Accordingly, I permit a Section 1983 conspiracy claim to proceed against those defendants based on the theory that they conspired to deprive Bennet of his Eighth Amendment rights.

C. Eighth Amendment Excessive Force

I further construe Bennet's complaint to bring an Eighth Amendment excessive force claim against Price, Kwaak, Stager, and Pelletieri. "Generally, to find that excessive force was used in violation of the Eighth Amendment, a plaintiff must prove by the preponderance of the evidence, that force was used against the plaintiff, and that such force was used maliciously and sadistically to cause harm, and not in a good-faith effort to maintain or restore discipline." *Henry v. Dinelle*, 929 F. Supp. 2d 107, 116 (N.D.N.Y. 2013), *aff'd*, 557 F. App'x 20 (2d Cir. 2014); *see also Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992).

Bennet alleges that shortly after Milner attacked him on December 26, 2021, the correctional officers who were present physically separated Bennet and Milner. Doc. No. 1 at ¶ 68. In doing so, Price, Kwaak, Stager, and Pelletieri tackled Bennet, causing his head to strike the concrete wall and floor. *Id*. at ¶ 68. Then, Pelletieri, Kwaak, and Stager struck Bennet "several times in the body" and "force[d] his face down into the ground, mashing his face against the tile floor." *Id*. (cleaned up). Based on those factual allegations, I construe Bennet's complaint to state a claim of Eighth Amendment excessive force against Price, Kwaak, Stager, and Pelletieri.

D. Section 1983 Failure to Intervene

I also liberally construe Bennet's complaint to raise a failure to intervene claim against Ortiz and Officer Kenney, as well as the other corrections officers present during the December 26, 2021 incident. "Absent direct participation in an act of excessive force, defendants may still

9

be held liable for constitutional violations under a failure-to-intervene theory." *Livingston v. Hoffnagle*, 2021 WL 3888283, at *5 (N.D.N.Y. Aug. 3, 2021), *report and recommendation adopted*, 2021 WL 3885247 (N.D.N.Y. Aug. 31, 2021) (citing *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001)). An officer may be held liable for failure to intervene when "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008), *aff'd sub nom. Jean-Laurent v. Wilkerson*, 461 F. App'x 18 (2d Cir. 2012).

Bennet alleges that Ortiz and Officer Kenney were present during the December 26, 2021 incident and were holding Milner back when Price, Kwaak, Stager, and Pelletieri tackled Bennet. Doc. No. 1 at ¶ 68. Therefore, to the extent that other defendants acted with excessive force against Bennet during that incident, Ortiz and Officer Kenney were present and did not intervene to prevent the harm.

Bennet's failure to intervene claim may also proceed against Price, Kwaak, Stager, and Pelletieri to the extent that it is later determined that (1) one or more of the defendants present during the December 26, 2021 attack engaged in excessive force, and (2) the defendants not personally involved in inflicting that excessive force nevertheless failed to intervene.

E.  <u>Tort Law</u>

I also liberally construe Bennet's complaint to bring the tort-law claims of battery, assault, and intentional infliction of emotional distress against Milner.

Bennet's complaint contains factual allegations supporting a battery claim against Milner. "An actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or

10

offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results." Restatement (Second) of Torts § 13 (1965). Bennet alleges several incidents in which Milner threw bodily fluids at Bennet. *E.g.*, Doc. No. 1 at ¶ 48. Bennet also alleges that on December 26, 2021, Milner physically attacked him and struck him. *Id*. at ¶ 66. I therefore permit a battery claim against Milner to proceed.

      Bennet has also plead an assault claim against Milner.

> (1) An actor is subject to liability to another for assault if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension. (2) An action which is not done with the intention stated in Subsection (1, a) does not make the actor liable to the other for an apprehension caused thereby although the act involves an unreasonable risk of causing it and, therefore, would be negligent or reckless if the risk threatened bodily harm.

Restatement (Second) of Torts § 21 (1965). In addition to the previously-mentioned allegations regarding Milner's conduct, Bennet also alleges that Milner frequently made violent threats toward him. For example, Bennet alleges that during the first week of December 2021, when he and Milner were in neighboring cages for outdoor recreation, Milner held a bottle of urine through the caging, sprayed Bennet with the urine, and "threaten[ed] and verbally harass[ed]" Bennet for two hours. *Id*. at ¶¶ 48-50. I therefore conclude that Bennet has plausibly pled an assault claim against Milner sufficient for this stage of the proceedings.

      I also liberally construe Bennet's complaint to plead a claim of intentional infliction of emotional distress against Milner. "To establish a claim for intentional infliction of emotional distress, the plaintiff must allege '(1) that the actor intended to inflict emotional distress or that [he] knew or should have known that emotional distress was the likely result of [his] conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of

11

the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe.'" *Powell v. Jones-Soderman*, 433 F. Supp. 3d 353, 377 (D. Conn. 2020), *aff'd*, 849 F. App'x 274 (2d Cir. 2021) (quoting *Appleton v. Bd. of Educ.*, 254 Conn. 205, 210 (2000)). Bennet avers that Milner assaulted him with bodily fluids, including urine and fecal matter, on multiple occasions. Doc. No. 1 at ¶¶ 48, 75, 78. For example, Bennet alleges that Milner would "come to [Bennet's] cell and verbally harass him and threaten him and spray urine and fecal matter at him through the cell door . . . at least four times a week." *Id*. at ¶ 75. Bennet further alleges that Milner would "yell[] out of his cell door on a daily basis," making verbal threats to Milner. *Id*. at ¶ 52. Moreover, Bennet alleges that Milner physically and violently attacked him on December 26, 2021 as Bennet was exiting the shower. *Id*. at ¶ 66. All those factual allegations support a claim of intentional infliction of emotional distress.

Accordingly, claims of battery, assault, and intentional infliction of emotional distress may proceed against Milner.

## ADDITIONAL ORDERS

**(1)** Within twenty-one (21) days of this Order, the Clerk shall verify the current work addresses of: Warden Washington, Deputy Warden Kenny, Deputy Warden Snyder, Captain Lugo, Commander Hurdle, Officer Griffin, Officer Kenney, Officer Ortiz, Officer Price, Officer Kwaak, Officer Stager, Officer Pelletieri, Lieutenant Grant, Lieutenant Cary, Lieutenant McKellin, and Nurse Oliveris. The Clerk shall also verify a current prison address for Milner. The Clerk shall then mail a copy of the Complaint, this Order, and a waiver of service of process request packet to each defendant in his or her individual capacity at his or her confirmed address. On the thirty-fifth (35th) day after mailing, the Clerk shall report to the Court on the status of each request. If any defendant fails to return the waiver request, the Clerk shall make

arrangements for in-person service by the U.S. Marshals Service and that defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

**(2)** The defendants shall file a response to the complaint, either an answer or motion to dismiss, within thirty (30) days from the date the Notice of Lawsuit and Waivers of Service of Summons forms are mailed to them. If they choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claims recited above. They may also include all additional defenses permitted by the Federal Rules.

**(3)** Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within six months (180 days) from the date of this Order. Discovery requests need not be filed with the Court.

**(4)** All motions for summary judgment shall be filed within seven months (210 days) from the date of this Order.

**(5)** If Bennet changes his address at any time during the litigation of this case, Local Rule 83.1(c)2 provides that Bennet MUST notify the Court. Failure to do so can result in the dismissal of the case. Bennet must give notice of a new address even if he is incarcerated. Bennet should write PLEASE NOTE MY NEW ADDRESS on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If Bennet has more than one pending case, he should indicate all case numbers in the notification of change of address. Bennet should also notify the defendants or the attorney for the defendants of his new address.

**(6)** Bennet shall utilize the Prisoner Efiling Program when filing documents with the Court. Bennet is advised that the Program may be used only to file documents with the Court.

Local Court Rule 5(f) provides that discovery requests are not to be filed with the Court. Therefore, discovery requests must be served on the defendant's attorney by regular mail.

**(7)** The Clerk shall immediately enter the District of Connecticut Standing Order Re: Initial Discovery Disclosures concerning cases initiated by self-represented inmates and shall send a copy of the Standing Order to the parties.

**(8)** The Clerk shall send a courtesy copy of the complaint and this Order to the Connecticut Attorney General and the Department of Correction Legal Affairs Unit.

So ordered.

Dated at Bridgeport, Connecticut, this 7th day of December 2023.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge
